Mr. Chief Justice Alvey
delivered the opinion of the Court:
This is an appeal from the Supreme Court of the District of Columbia, and the question involved arises under the Seventy-third rule of that court. The action was brought by the appellee, Thomas W. Stubblefield, as indorsee of a promissory note, dated August 12, 1899, for $375, payable three months after date, made by the present appellant, John L. Wirt, payable to C. T. Havenner or order, and by the latter indorsed to the appellee, the plaintiff in the action. The action was brought jointly against both the maker and the indorser of the note, as authorized by the statute. Judgment was rendered against the indorser, but the maker, the appellant, resisted judgment under the rule of court, upon the defense interposed by him, by plea and affidavit, “that the said note sued on was given in payment of money alleged to be due on a certain wager or gaming transaction, to wit, a wager upon the fluctuations in the price of certain stock wherein the said defendant lost, and the said note was given to meet the payment of the said loss.” The affidavit of the defendant was filed to support this plea; but the court below ruled the affidavit to be insufficient, under the Seventy-third rule of the court, and thereupon entered judgment against the defendant under the rule, for want of sufficient affidavit of a valid defense; and the defendant has appealed.
*286 This defense of gaming consideration for the note, set up by plea and affidavit, is made upon the assumption that the old British statutes against gaming, of 16 Car. 2, Ch. 7-, and 9 Anne, Ch.'14, were in force in the State of Maryland at the time of the cession by that State of the District of Columbia to the United States, or at the time of the passing of the act of Congress of February 27, 1801, declaring what laws should be in force in this District, and that they formed a part of the statute law of the State that was adopted and declared of force in this District by the act of Congress. That those British statutes against gaming were in force in the State of Maryland in 1801, there can be no question or doubt (Alex. Brit. Stats. 476, 689); and that they were adopted and became a part of the law of this District, is equally free of doubt. Fleming v. Foy, 4 Cranch Cir. Ct. Rep. 426. And those statutes are still in force here, except as they may have been repealed by force of the act of Congress of January 12,1899, known as the “ Negotiable Instrument Law,” so far as they relate to or may affect negotiable instruments, such as bills and notes.
Gaming consideration is not mentioned, nor is that of usury, in the recent act of Congress of January 12,1899; nor aré any of the statutes upon the subject of gambling or usury referred to, and therefore, if the old British statutes to which we have referred have been partially repealed by the act of Congress, it is by implication and not by express terms. The act of Congress does provide; however, by section 190, “ That all laws of.force within the District of Columbia, inconsistent with the foregoing provisions of this act, be, and the same hereby are, repealed.” It must, therefore, have been supposed, and within the contemplation of Congress, that there were laws or legislation in force proper to be repealed ; and the question is, what laws were thus intended to be repealed ?
^Toffetermine, then, the question, whether there is conflict or inconsistency between the provisions of the act of *287 Congress and the effect and operation of the British statutes^? 16 Can’. 2, Ch. 7, and 9 Anne, Ch. 14^/tVe must consider not only the express provisions of the act of Congress, but tlie policy and object of its enactment, as compared with the effect and operation of the statutes against gamings We-know the origin and history of the act of Congress. We know it is largely derived,- in its form and provisions, from the English act upon the subject; and we know, moreover, thatrtfín great and leading object of the act, not only with Congress, but with the large number of the principal commercial States of the Union that have adopted it, has been to establish a uniform system of law to govern negotiable instruments wherever they might circulate or be negotiated. It was not only uniformity of rules and principles that was designed, but to embody in a codified form, as fully as possible, all the law upon the subject, to avoid conflict of decisions, and the effect of mere local laws and usages that have heretofore prevailed. The great object sought to be accomplished by the enactment of the statute was, to free the negotiable instrument, as far as possible, from all latent or local infirmities that would otherwise inhere in it, to the prejudice and disappointment of innocent holders, as against all of the parties to the instrument professedly bound thereby. This clearly could not be effected so long as the instrument was rendered absolutely null and void by local statute, as against the original maker or acceptor; as is the case by the operation, indeed, by the express provision, of the statutes of Charles and Anne^, For although the statutes declare that all bills and notes made upon gaming considerations shall be void to all intents and purposes, yet it has never been allowed as a valid objection to an action against the drawer or indorser that the bill or note was accepted or made on a gaming consideration. This construction of the statutes has proceeded upon the ground that it was necessary to further the object of the statutes; for to exempt- the drawer or an indorser from suit might assist a *288 winner, whom the statutes meant to punish, not to protect. Edwards v. Dick, 4 B. & Ald. 212. But as against the maker of a note or the acceptor of a bill, the instrument, was absolutely null and void, even in the hands of an innocent holder for value, taking the paper in due course before maturity. This was certainly an evil that required correction; and the necessity for the correction is founded upon a just commercial policy of sustaining the credit and circulation of negotiable instruments, and falls clearly within the object and policy of the act of Congress of January 12, 1899. The old English statutes, to which we have referred, have been repealed in England, by Stat. 8 and 9 Viet., Ch. 109, and other provisions substituted for them; and we are not aware that the provisions of- those old statutes, so far as they were made to affect negotiable instruments, constitute the existing law in any State of the Union; though such statutes may have been, and doubtless were, extensively adopted’ in the last and the early part of the present century.
By the “Negotiable Instrument Act” of January 12, 1899, in its 55th section, it is provided “ that the title of a person who negotiates an instrument is defective within the meaning of this act, when he obtained the instrument or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud.”
And by section 60 it is provided “that the maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse.”
Consideration is illegal either at the common law, or by statute. When the title to a bill or note is defective by reason of an illegal consideration at the common law, the instrument is good in the hands of an innocent indorsee for value against all parties. But not so where the consideration is *289 made illegal by statute, and the instrument itself is declared to be null and void, as in cases of bills or notes made upon gambling or usurious transactions. Cromwell v. Sac County, 96 U. S. 60.
This subject, with the distinction just stated, is expounded with great force and clearness by Judge Story, in his work on Promissory Notes, in sections 191 and 192. He says, “that a bona fide holder for value, without notice, is entitled to recover upon any negotiable instrument, which' he has received before it has become due, notwithstanding any defect or infirmity in the title of the person from whom he derived it; as, for example, even though such person may have acquired it by fraud, or even by theft, or by robbery. And the same doctrine will generally apply to all cases of a bona fide holder for value, without notice before it becomes due, where the original note, or the indorsement thereof, is founded on an illegal consideration; and this upon the same general ground of public policy, without any distinction between a case of illegality, founded in moral crime or turpitude, which is malum in se, and a case founded in the positive prohibition of a statute, which is malum prohibitum-, for, in each case, the innocent holder is, or may be, otherwise exposed to the most ruinous consequences, and the circulation of negotiable instruments would be materially obstructed, if not totally stopped. The only exception is, where the statute, creating the prohibition, has, at the same time, either expressly, or by necessary implication, made the instrument absolutely void in tbe hands of every holder, whether he has such notice, or not. There are few cases, in which any statute has created a positive nullity of such, instruments, either in England or America. The most important seem to be the statutes against gaming, and the statutes against usury. And the policy of these enactments has been brought into so much doubt in our day, that in England the rule, as to usury and gaming, and some other cases, has been changed by recent statutes; and a total *290 repeal, or partial relaxation of it, has found its way into the legislation of America.”
is difficult to conceive, if we bear in mind the object and policy intended to be promoted by, as well as the entire scope and express provisions of, the “Negotiable Instrument Law,” that the framers of that act ever intended to save and preserve unrepealed, as part of the law governing negotiable instruments, the old English statutes of 16 Car. 2, and 9 Anne, against gaming. On the contrary, it was most clearly among the objects and purposes of that act, to get rid of all such impediments and hindrances to the circulation of negotiable instruments as had been created by those old statutes, and to embody the entire law upon the subject, as far as practicable, into one well digested and consistent act. It is true, as a general rule, that where there are two acts on the same subject, the rule is to give effect to both, if it can consistently be done. “ But if the two are repugnant in anjr of their provisions, the latter act, without any repealing clause, operates to the extent of a repugnancy as a repeal of the first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act.” Davies v. Fairbairn, 3 How. 636 ; United States v. Tynen, 11 Wall. 88, 92. It is quite clear that the act of Congress was intended to cover the whole subject of negotiable instruments as far as it could be done by statute; and therefore to exclude the operation and effect of former statutes like those of Charles and Anne. But there is manifest inconsistency or repugnancy, as we have shown, between the effect and operation of those old English statutes, so far as they affect negotiable instruments, and the provisions and policy of the “Negotiable Instrument Law” of Congress; and this construction of the latter act is strongly fortified by the general provision of that act which declares, that “In any case not provided for *291 in this act the rules of the law merchant shall govern.” We know that no such prohibition or nullity as that declared in the old statutes against gaming has any recognition in the law merchant. The law merchant is a system of commercial law founded upon the most liberal and enlarged customs and usages, for the promotion of trade, and which is applied to for the decision of the causes of merchants, by such general rules as obtain in all commercial countries, and is, therefore, wholly inconsistent with the gaming statutes^and it applies often even in matters relating to domestic trade, as, for instance, with regard to the drawing, the acceptance, and the transfer of inland bills of exchange. 1 Black. Com. 173. And since the statute 3 and 4 Anne, Ch. 9, promissory notes, when indorsed, are placed upon the same footing of inland bills of exchange, if they were not so before that statute.
We are clearly of opinion that the British statutes of 16 Car. 2, Ch. 8, and 9 Anne, Ch. 14, against gaming, so far as they might or would, if in force, affect the validity of the negotiable instruments embraced by the act of Congress, are inconsistent with the provisions of the latter act, and they are, therefore, to the extent that they are so inconsistent or repugnant to the act of Congress, repealed, and no longer, as to negotiable instruments, in force in this District.
The affidavit of the defendant, filed under the Seventy-third rule of the court, showing no sufficient defense to the action, there was no error in entering the judgment for the plaintiff under that rule; and the judgment appealed from must be affirmed; and it is so ordered. Judgment affirmed.